# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SAMIRA RANDOLPH-ALI,** | : | CIVIL ACTION NO. 1:16-CV-1625 |
| Plaintiff | : | (Chief Judge Conner) |
| v. | : | |
| **ANTHONY MINIUM,** | : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff Samira Randolph-Ali ("Randolph-Ali") commenced this action asserting manifold federal civil rights and state-law tort claims against various state and municipal entities and officials. Before the court is a motion (Doc. 51) for summary judgment by the sole remaining defendant. We will grant the motion.

## I. Factual Background and Procedural History[1]

In August 2014, Randolph-Ali resided with her five minor children at 34 South Harrisburg Street in Steelton, Pennsylvania. (Doc. 52 ¶¶ 3, 6-7). At that time, Randolph-Ali had applied for and received an active protection from abuse ("PFA") order against her then-husband, Umar Ali ("Ali"). (Id. ¶ 8; see Doc. 52-2, Randolph-

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 52, 58). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.

Ali Dep. 8:2-9).[2] The PFA evicted Ali from the residence at 34 South Harrisburg Street but permitted "full contact between father and children" and "limited peaceful contact between parents regarding the children." (Id. ¶¶ 9-10).

Defendant Anthony Minium ("Chief Minium") is currently employed as the Chief of Police for the Steelton Borough Police Department (the "Department"). (Id. ¶ 1). In August 2014, Chief Minium was employed by the Department as a detective. (Id. ¶ 2). Chief Minium was familiar with Randolph-Ali and her family and knew that Randolph-Ali had applied for and received PFA orders against Ali previously. (Id. ¶¶ 27-29).

On August 6, 2014, Ali assaulted Randolph-Ali inside the home at 34 South Harrisburg Street. (Id. ¶ 11). Randolph-Ali's five minor children as well as three neighbor children were in the home at the time. (Id. ¶¶ 12-13). One of the children called 911 to request police assistance. (Id. ¶ 14). Ali was still present in the home when 911 was called. (Id. ¶ 15). The child reported to the dispatcher that there was an active domestic violence situation between Ali and Randolph-Ali and indicated that she "needs police." (Id. ¶¶ 16-17). The child then disconnected the call after only 15 seconds. (Id. ¶ 18). The dispatcher reported "lots of commotion in [the] background" and described the emergency call as "very active." (Id. ¶¶ 19, 22). The dispatcher's attempts to recontact the caller went directly to voicemail. (Id. ¶ 21).

---

[2] Deposition transcripts have been filed by the parties at numerous, separate docket entries. We will cite to full deposition transcripts as "[Name] Dep.," without repeating the docket entry citation *passim*. We employ this citation convention for any full deposition transcripts cited throughout this memorandum. To the extent partial deposition transcripts are cited, we will retain docket entry citations for ease of location.

2

Several officers responded to the scene, including Chief Minium and detective Troy Elhajj ("Detective Elhajj"). (Id. ¶¶ 23-24, 26). Outside the home, officers encountered "a crying minor female child" who stated that her friend was in the home and that she had overheard fighting and crying coming from inside. (Id. ¶¶ 30-31). Chief Minium and Detective Elhajj encountered Randolph-Ali at the front door. (See id. ¶ 32; Doc. 52-2, Randolph-Ali Dep. 28:18-29:8). Randolph-Ali was visibly upset when officers arrived. (See Doc. 52 ¶ 35). Chief Minium observed that Randolph-Ali's children and the neighbor children, then in the living room, were "upset and crying." (Id. ¶¶ 36, 38).

Randolph-Ali testified that Chief Minium approached her in a "nasty" and "angry" manner and behaved differently toward her than he had in the past. (See Doc. 52-2, Randolph-Ali Dep. 30:10-23-25). Chief Minium queried where Ali was, and Randolph-Ali responded that "he ran" as soon as the police had been called. (Id. ¶¶ 39, 41; see also Doc. 52-2, Randolph-Ali Dep. 29:9-12, 29:22-30:15). According to Randolph-Ali, Chief Minium replied, "you are not bringing this shit to Steelton," suggesting to Randolph-Ali that Chief Minium had preconceived notions about her marital relationship. (Doc. 52-2, Randolph-Ali Dep. 30:13-23). One of Randolph-Ali's children then pointed upstairs, signaling to the officers that, notwithstanding Randolph-Ali's contrary statement, Ali might have still been in the home. (Doc. 52 ¶¶ 39, 41-42; Doc. 52-1, Minium Dep. 19:11-19). Chief Minium and Detective Elhajj also observed a strong odor of recently burnt marijuana emanating from the residence. (Doc. 51 ¶ 44).

3

Chief Minium advised Randolph-Ali that he needed to enter the home to ensure it was safe for her and the children and to investigate the marijuana smell. (Id. ¶¶ 45-47; see Doc. 52-2, Randolph-Ali Dep. 32:9-15). Randolph-Ali refused to allow Chief Minium to enter the home, (Doc. 52 ¶ 47; Doc. 52-2, Randolph-Ali Dep. 32:16-20), and insisted that Ali was not there, (Doc. 52-2, Randolph-Ali Dep. 32:13-15). Chief Minium warned that he would charge Randolph-Ali with obstruction of justice if she did not allow him to secure the scene and investigate. (Doc. 52 ¶ 48). Randolph-Ali again refused to comply, (id. ¶ 49), instead asking Chief Minium, "why are you treating me like [this?]" and "why would you charge me with obstruction? What am I doing?" (Doc. 52-2, Randolph-Ali Dep. 33:3-12). Randolph-Ali testified that Chief Minium waited "not even five minutes" before stating that he was going to charge her with obstruction if she did not comply. (Doc. 52 ¶ 52).

The parties agree that an altercation ensued but diverge in their accounts thereof.[3] Randolph-Ali avers that Chief Minium "bum-rushed her to the floor and started tasering her." (Doc. 58 ¶ 53). Randolph-Ali described the contact as "like a football tackle," stating that Chief Minium "[g]rabbed me by my waist and tackled me to the ground." (Doc. 52-2, Randolph-Ali Dep. 35:11-19). Randolph-Ali stated that Chief Minium deployed his Taser three times and that he did not warn her before doing so. (Id. at 33:23-24, 42:8-23).

---

[3] The parties also agree that, at the time of the incident, Chief Minium and Randolph-Ali were approximately the same height, but Randolph-Ali was physically larger, weighing fifty pounds more than Chief Minium. (Doc. 52 ¶ 55).

4

Chief Minium offered a different narrative. Chief Minium testified that he "reached with [his] right hand, told [Randolph-Ali] she was under arrest, and grabbed her right arm," at which point Randolph-Ali "pulled back and we went inside the house" and "[w]e both went to the ground." (Doc. 52-1, Minium Dep. 24:23-25:8). Chief Minium further testified that Randolph-Ali continued to push against him and refused to remain on the ground; that he continued attempting to physically restrain Randolph-Ali and commanded that she stop resisting; and that he warned Randolph-Ali that he would deploy his Taser if she did not comply. (See id. at 25:5-27:18). Chief Minium claimed that he then deployed his Taser in drive-stun mode twice.[4] (Doc. 52 ¶ 57; Doc. 52-1, Minium Dep. 27:10-21). Chief Minium does not dispute that "the tasering happened within seconds of the initial physical contact." (Doc. 52 ¶ 58). Detective Elhajj submitted an affidavit which tracks Chief Minium's version of events. (See Doc. 52-7).

After the Taser was deployed, Randolph-Ali complied with officers' instructions and was handcuffed, placed in a police vehicle, and transported to Dauphin County Booking Center. (Doc. 52 ¶¶ 59-60, 62). Randolph-Ali did not report an injury to arresting officers or request medical treatment at any point after the altercation. (Id. ¶ 63). Randolph-Ali testified, and the police incident report

---

[4] Randolph-Ali does not dispute that Chief Minium deployed the Taser in "drive-stun" mode. (See Doc. 52 ¶ 57; Doc. 58 ¶ 57). A Taser can typically be used in one of two ways: (1) to incapacitate a suspect, by firing two wire probes which, when they make contact with clothing or skin, transmit an electrical signal that causes temporary loss of neuromuscular control, or (2) for pain compliance, in a "drive-stun" or "touch-stun" mode, which applies a painful electrical shock but does not incapacitate the subject. See Brown v. Rowan, No. 14-5874, 2016 WL 861331, at *2 n.1 (E.D. Pa. Mar. 7, 2016) (collecting cases).

5

confirms, that Ali approached the residence as Randolph-Ali was being escorted to a police vehicle. (Id. ¶ 60). A subsequent search revealed a burnt marijuana cigarette inside of the home. (Id. ¶ 61). According to the police incident report and affidavit of probable cause, Ali denied that any assault had occurred, initially admitted (but later denied) that the marijuana belonged to him, and was informed by officers that he would receive a summons in the mail. (Doc. 52-8 at 2; Doc. 52-9 at 5).

On August 7, 2014, Randolph-Ali was charged with six offenses resulting from the August 6 incident, to wit: endangering the welfare of children, obstruction of justice, resisting arrest, disorderly conduct, small amount of marijuana, and drug paraphernalia. (Id. ¶ 64). On August 13, 2015, Randolph-Ali entered a guilty plea to the charge of "Disorderly Conduct Hazardous/Physical Offense." (Id. ¶ 66). Randolph-Ali commenced this action *pro se* on August 5, 2016. Her initial pleading raised civil rights and state-law tort claims against a number of defendants arising out of Randolph-Ali's encounters with local law enforcement, child services, and other agencies and officials over the past several years. Randolph-Ali is now represented by retained counsel. After several amended pleadings and pretrial motion practice, this matter is proceeding against a single defendant, Chief Minium, on Randolph-Ali's Fourth Amendment excessive force claim and state law assault and battery claims.

## II. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a

6

jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forward with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

### III. Discussion

The factual record before the court is largely undisputed. Chief Minium contends that, even if we resolve any extant disputes in Randolph-Ali's favor, he is entitled to summary judgment on both the constitutional and state law claims. We turn first to the Fourth Amendment excessive force claim.

#### A. Federal Constitutional Claim

Section 1983 of Title 42 of the United States Code creates a private cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

7

To establish a Section 1983 claim, plaintiffs must prove a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Randolph-Ali claims that Chief Minium used excessive force in violation of her Fourth Amendment rights when he (1) "tackled" or "bum-rushed" her to the ground and (2) deployed his Taser either two or three times. Chief Minium counters that his use of force was reasonable and that, even if it was not, qualified immunity shields him from civil liability. Our analysis begins and ends with Chief Minium's qualified immunity defense.

Qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted. See Pearson v. Callahan, 555 U.S. 223, 244-45 (2009). No liability will attach if a reasonable actor could have believed the challenged conduct was in compliance with settled law. Id.; see also Springer v. Henry, 435 F.3d 268, 280 (3d Cir. 2006). The doctrine cloaks government officials with "immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted), and ensures resolution of "insubstantial claims" against those officials "at the earliest possible stage in litigation," Pearson, 555 U.S. at 231-32 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991) (*per curiam*); Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987)). The defense generally shields "all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The burden to establish

qualified immunity rests with the defendant claiming its protection. Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

A court evaluating a claim of qualified immunity considers two distinct inquiries: whether, based on the record evidence, a constitutional right has been violated and, if so, whether that right was "clearly established" at the time of the alleged violation. See Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232). A court may begin its qualified immunity analysis with either prong. Pearson, 555 U.S. at 236. We begin with the first.

1. *Violation of a Constitutional Right*

Courts evaluate Fourth Amendment excessive force claims under an "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388, 397 (1989); Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004) (quoting Graham, 490 U.S. at 396-97). Whether a particular use of force is "reasonable" depends upon the facts of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Other relevant factors include whether "the physical force applied was of such an extent as to lead to injury[,] the possibility that the persons subject to police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Estate of Smith v. Marasco, 430 F.3d 140, 149-50

(3d Cir. 2005) (quoting Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997), abrogated on other grounds by Curley v. Klem, 499 F.3d 199, 209-11 (3d Cir. 2007)).

The Supreme Court has acknowledged that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396 (citing Terry v. Ohio, 392 U.S. 1, 22-27 (1968)). The Court has also instructed that we must evaluate the force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," recognizing that officers will often be "forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97. Importantly, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. at 396 (citation omitted).

The events leading up to Chief Minium's use of force on August 6, 2014, are undisputed. Chief Minium and other officers were dispatched to an "active" emergency scene following a minor child's report of domestic assault perpetrated by Ali against Randolph-Ali. These officers were aware of past domestic disputes at the subject residence. As soon as officers arrived on scene, another minor child told Chief Minium that she had heard fighting and was concerned for her friend who was inside the home. Chief Minium approached the front door and observed several visibly upset children in the living room. He and Detective Elhajj detected the smell of recently burnt marijuana. And although Randolph-Ali insisted that Ali had left the home, one of the children gestured in a manner suggesting that Ali was

10

still upstairs. Chief Minium made multiple requests to enter the home to ensure the children's safety and investigate the odor of marijuana, and all were denied. For purposes of the instant motion only, we credit Randolph-Ali's version of the events that followed, *viz.*, that she did not allow officers inside, that she responded to each request to enter with questions about the officers' conduct, and that Chief Minium reacted by immediately tackling Randolph-Ali to the floor and deploying his Taser in drive-stun mode three times.

We do not believe that a rational jury could conclude that these actions were unreasonable under the circumstances. This is not a case of a gratuitous use of force on a subject who had already been subdued. Nor is this a case involving unnecessary use of force on an obedient or nonthreatening subject. Randolph-Ali admits that the nature of the emergency call and observations on scene gave Chief Minium cause to be concerned for the safety of Randolph-Ali and the eight children in the home. (Doc. 52 ¶¶ 19, 22, 46; Doc. 58 ¶¶ 19, 22, 46). She admits that one of her children indicated to officers that the perpetrator of the violence was still present, potentially placing the occupants of the home in danger. (Doc. 52 ¶ 42; Doc. 58 ¶ 42). And she admits that she failed to comply with multiple directives to move aside and that she refused to allow officers to enter the home. (Doc. 52 ¶¶ 47, 49; Doc. 58 ¶¶ 47, 49). Randolph-Ali later pled guilty to a disorderly conduct charge arising out of this interaction with police. (See Doc. 52 ¶¶ 64-69; Doc. 58 ¶¶ 64-69).

On this record, no trier of fact could conclude that Chief Minium's use of force was unreasonable. Officers encountered an active domestic violence scene and had an objective and ongoing basis to be concerned for the welfare of both the

domestic violence victim and the children present in the home. When Randolph-Ali impeded officers' efforts to secure the scene, Chief Minium applied the degree of force that he reasonably believed to be necessary to subdue Randolph-Ali. Chief Minium immediately ceased applying force once Randolph-Ali was in handcuffs, and Randolph-Ali does not aver that the force was so strong as to cause injury. On these undisputed facts, a jury could not find that the force applied by Chief Minium was objectively unreasonable.[5]

### 2. *Clearly Established Law*

Chief Minium argues in the alternative that the constitutional right purportedly implicated in this case was not clearly established at the time of the August 2014 incident. The Supreme Court has admonished that, when analyzing qualified immunity, courts should not "define clearly established law at a high level of generality." al-Kidd, 563 U.S. at 742; see also Kisela v. Hughes, 584 U.S. __, 138 S. Ct. 1148, 1152 (2018) (*per curiam*); Mullenix v. Luna, 577 U.S. __, 136 S. Ct. 305, 308 (2015) (*per curiam*). A plaintiff need not produce a case "directly on point," but existing precedent must have placed the constitutional question "beyond debate." Mullenix, 136 S. Ct. at 308 (quoting al-Kidd, 563 U.S. at 741). The state actor must

---

[5] Randolph-Ali suggests for the first time in her Rule 56 opposition brief that Chief Minium's conduct was unlawful because he entered the home to arrest Randolph-Ali without a warrant. (Doc. 59 at 3). Randolph-Ali does not assert an unlawful entry claim or theory in her fourth amended complaint. (See Doc. 45). In any event, the Third Circuit has long held that unlawful entry does not *per se* establish liability for all injuries sustained during a subsequent arrest. See Bodine v. Warwick, 72 F.3d 393, 400-01 & n.10 (3d Cir. 1995); see also Snell v. City of York, 564 F.3d 659, 672 (3d Cir. 2009) ("We have rejected similar efforts to bootstrap excessive force claims and probable cause challenges." (citation omitted)).

have "fair notice" that the conduct was impermissible under federal law; thus, the reasonableness of the challenged action "is judged against the backdrop of the law at the time of the conduct." Kisela, 138 S. Ct. at 1152 (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (*per curiam*)).

The appropriate inquiry is whether the Constitution prohibited the officer's conduct in "the specific context of the case," *viz.*, the situation the officer confronted. Mullenix, 136 S. Ct. at 308 (citing Brosseau, 543 U.S. at 198). The Supreme Court, nevertheless, has consistently recognized that general statements of the law can suffice to give "fair and clear warning" to state actors when the circumstances represent an "obvious case" of unlawfulness, Kisela, 138 S. Ct. at 1153; White v. Pauly, 580 U.S. __, 137 S. Ct. 548, 552 (2017) (*per curiam*), including, for example, when there is an "absence of a serious threat of immediate harm to others," Russell v. Richardson, 905 F.3d 239, 252 (3d Cir. 2018) (quoting Davenport v. Borough of Homestead, 870 F.3d 273, 281 (3d Cir. 2017)).

The summary judgment record provides little assistance in defining the contours of the constitutional right at issue or determining whether that right was clearly established. Randolph-Ali does not identify what she perceives the specific right to be, beyond the blanket suggestion that the use of force was necessarily "excessive" because Randolph-Ali was herself a victim. (See Doc. 59 at 1-3). We find that our inquiry, properly framed, is whether Randolph-Ali had a right to be free from physical force and the use of a Taser as a victim-witness who refused to allow officers to access her home to secure an active domestic violence scene and

ensure the safety of the home's occupants when officers had reason to believe that the perpetrator may still be at the scene.

As noted *supra*, it is clear that an officer's use of force is excessive and contravenes the Fourth Amendment when it is objectively unreasonable under the circumstances. See Graham, 490 U.S. at 396-97; Rivas, 365 F.3d at 198 (quoting Graham, 490 U.S. at 396-97). It is equally clear, however, that Graham and other cases articulating the objective reasonableness standard "do not by themselves create clearly established law outside an 'obvious case.'" Kisela, 138 S. Ct. at 1153 (quoting White, 137 S. Ct. at 552). The Supreme Court has cautioned that "[s]pecificity is especially important in the Fourth Amendment context," where "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Id. at 1152-53 (quoting Mullenix, 136 S. Ct. at 308). Because the line between acceptable and excessive force is often "hazy," Mullenix, 136 S. Ct. at 312, an officer is entitled to qualified immunity absent existing precedent which "'squarely governs' the specific facts at issue" and adequately notifies the officer that a specific use of force is unlawful, Kisela, 138 S. Ct. at 1153 (quoting Mullenix, 136 S. Ct. at 309, 312).

Randolph-Ali's four-page opposition brief does not identify a single judicial decision—precedential or persuasive—indicating to law enforcement that conduct approximating Chief Minium's would contravene the Fourth Amendment. Nor does she argue that Chief Minium's conduct was so egregious as to constitute an "obvious case" for qualified immunity purposes. Notwithstanding the uninspired effort of plaintiff's counsel, we have independently canvassed the state of the law

at the time of the August 2014 incident with respect to the two challenged actions: the use of a physical "tackle" maneuver and the deployment of a Taser.

We have located no authority suggesting that the use of a "tackle" or "bum-rush" was unreasonable. As we have observed, Fourth Amendment jurisprudence recognizes that some degree of physical force or coercion may be necessary to effect an arrest. Graham, 490 U.S. at 396. Physically subduing Randolph-Ali ostensibly was the least forceful option available to Chief Minium under the circumstances. A reasonable police officer in the situation confronting Chief Minium would not have believed that attempting to gain Randolph-Ali's compliance in this manner would violate clearly established law.

Likewise, no authority put Chief Minium on notice that his use of a Taser to subdue Randolph-Ali and secure the scene would violate the Fourth Amendment. Indeed, the existing body of law was to the contrary. The Supreme Court has not decided whether or under what circumstances the use of a Taser on a resisting or noncompliant person may be unreasonable. And the Third Circuit has not done so in a precedential opinion. See Brogan v. Tunkhannock Township, 302 F. Supp. 3d 670, 679 (M.D. Pa. 2018) (quoting Estep v. Mackey, 639 F. App'x 870, 874 n.4 (3d Cir. 2016) (nonprecedential)). But multiple courts of appeals, including the Third Circuit in a nonprecedential decision, had approved of the use of Tasers to subdue resisting or noncompliant individuals. See Brown v. Cwynar, 484 F. App'x 676, 681 (3d Cir. 2012) (nonprecedential) (citing Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004); Hinton v. City of Elwood, 997 F.2d 774, 781 (10th Cir. 1993); Russo v. City of Cincinnati, 953 F.2d 1036, 1044-45 (6th Cir. 1992)). There existed no bright-line

guidance for Chief Minium in determining whether he would violate the Fourth Amendment by using a Taser to subdue a noncompliant victim-witness who was obstructing officers' attempt to secure a "very active" domestic violence scene.

We conclude that Chief Minium's use of force did not violate Randolph-Ali's Fourth Amendment rights and that, even if it did, the particular right in question was not clearly established on August 6, 2014. A reasonable finder of fact could not conclude that Chief Minium's decisions to apply physical force and to deploy his Taser were "plainly incompetent" or that he "knowingly violated the law." Mullenix, 136 S. Ct. at 308 (quoting Malley, 475 U.S. at 341). Accordingly, Chief Minium is entitled to qualified immunity on the Fourth Amendment claim.

### B. State-Law Tort Claims

Randolph-Ali also asserts state-law assault and battery claims arising out of Chief Minium's conduct during the August 6, 2014 incident. Under Pennsylvania law, an "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994) (citation omitted). The Pennsylvania Supreme Court has held that a police officer making a lawful arrest "may use such force as is necessary under the circumstances to effectuate the arrest." Id. Whether that officer may be held liable for assault and battery depends upon "the

reasonableness of the force used."  Id.  An officer who applies "unnecessary or excessive" force is liable for assault and battery.  Id.

We determined *supra* that Chief Minium's use of force was not unreasonable, and thus not excessive, under the circumstances.  That analysis applies equally to Randolph-Ali's companion claims for assault and battery.  See, e.g., McNeil v. City of Easton, 694 F. Supp. 2d 375, 399-400 (E.D. Pa. 2010) (citing Renk, 641 A.2d at 293).  Accordingly, Chief Minium is also entitled to summary judgment on the state-law claims.

## IV. Conclusion

We will grant Chief Minium's motion (Doc. 51) for summary judgment in its entirety.  We will deny Chief Minium's pending motions (Docs. 62-65) *in limine* as moot.  An appropriate order shall issue.

       /S/ CHRISTOPHER C. CONNER
       Christopher C. Conner, Chief Judge
       United States District Court
       Middle District of Pennsylvania

Date:    March 21, 2019